Daniel REMSBURG, Appellant,

v.

The STATE of Texas, Appellee.

No. 06–06–00157–CR.

Court of Appeals of Texas, Texarkana.

Submitted March 5, 2007.

Decided March 30, 2007.

David A. Pearson, IV., Fort Worth, Ben A. Massar, Paris, for appellant.

Gary D. Young, Lamar County/Dist. Atty., Paris, for state.

Before MORRISS, C.J., CARTER and MOSELEY, JJ.

## OPINION

Opinion by Justice CARTER.

A jury found Daniel Remsburg guilty of aggravated assault against Greg Wilson, a law enforcement officer employed by the Texas Department of Public Safety. *See* TEX. PENAL CODE ANN. § 22.01(a)(1) (Vernon Supp.2006) (defining simple assault), § 22.02(a)(2) (Vernon 2003) (defining aggravated assault against a public servant). That offense is a first-degree felony. *See* TEX. PENAL CODE ANN. § 22.02(b)(2)(B) (Vernon Supp.2006). The jury assessed Remsburg's punishment at thirty years' imprisonment and no fine. Remsburg now appeals, raising three issues. We affirm.

## I. Background

During the early morning hours of December 18, 2005, Trooper Wilson was on routine traffic patrol in Paris, Texas. During this time, Wilson received an alert over his vehicle's police radio to be on the lookout for a gold Chevrolet Cavalier. Moments later, Wilson saw a vehicle matching that description. Wilson followed the suspected vehicle, determined that the driver was traveling sixty-five or sixty-six miles per hour on a road with a designated speed limit of sixty miles per hour, and made the decision to conduct a traffic stop. Before making contact with the driver, Wilson radioed the Lamar County Sheriff's Office about the license plate of the Cavalier he was in the process of stopping; the sheriff's office, in turn, notified the Paris Police Department about the location and circumstances of Wilson's traffic stop.

Wilson exited his police vehicle and approached the Cavalier. That vehicle still had its engine running, and Wilson asked the driver to turn off the ignition, which the driver did. Wilson then asked the driver (later identified in open court as Remsburg) for his driver's license and proof of liability insurance. Wilson testified Remsburg fumbled through several items inside his car, but was unable to find his driver's license. Wilson then opened

the driver's side door of Remsburg's vehicle and asked the latter to exit the vehicle.

Remsburg, however, did not comply with the request. According to Wilson, Remsburg responded by putting his foot on his vehicle's brake, turning the engine back on, and reaching for the gearshift. Meanwhile, Wilson's hand was still on the edge of the driver's side door, which had remained open while Remsburg restarted his vehicle. Wilson reached inside the vehicle and grabbed Remsburg in an attempt to extricate the driver. However, Wilson quickly realized that, because Remsburg was preparing to shift the car into gear, merely reaching inside the car would only endanger the officer's own life. So Wilson had a choice: he could either step away from the vehicle and hope he could get out of the way before being run over (which his academy training taught was too dangerous under the circumstances), or he could jump inside the now-moving vehicle. Wilson followed his academy advice and jumped inside the Cavalier.

The trooper then testified that, after he jumped into Remsburg's now-moving vehicle, Remsburg shifted the vehicle into reverse and later into drive. Remsburg eventually drove the Cavalier into a nearby ditch. Between the time Wilson had to jump into the car and the moment at which the car crashed, the officer and Remsburg continued to struggle over control of the car. Wilson was eventually able to subdue Remsburg (at least long enough to get the vehicle stopped) by striking the latter in the head with a flashlight. According to Wilson's testimony, Remsburg bent two of Wilson's fingers toward the back of the officer's hands in an effort to injure the officer. Wilson sustained an injury to his lower back during the melee.

Wilson also testified Remsburg continued to resist arrest after being sprayed with pepper spray and after being handcuffed.

Remsburg also testified. He admitted being stopped by Trooper Wilson for driving sixty-six miles per hour in a sixty mile per hour zone. Remsburg testified that, when he saw the flashing lights on the police vehicle, he immediately pulled to the side of the road and parked his car. Remsburg, however, also claimed he never turned off his engine—a claim that contradicted Wilson's testimony. Remsburg then told the jury he put his hand on the gearshift as a means of balancing himself when he reached across the front seat to open the glove box (inside of which he planned to look for his proof of liability insurance). Remsburg was unsure if he tried to move the gearshift at this time, but it was about this time that Wilson jumped inside the vehicle. Remsburg also admitted grabbing Wilson's hands; Remsburg, however, said his purpose in so doing was to prevent Wilson from shifting the vehicle into gear. Nonetheless, Remsburg admitted pushing the button necessary to engage the gearshift. Later in his testimony, Remsburg admitted he did not cooperate with the arresting officers. He also testified that he pushed the accelerator, but that such conduct was unintentional. He also denied resisting the officer's attempts to arrest him, denied saying he was a carrier of the human immunodeficiency virus, and claimed to be both a Christian and a druid.[1]

## II. Issues Presented

### A. Failure to Instruct on Concurrent Causation

---

1. A druid is "one of an ancient Celtic priesthood appearing in Irish and Welsh sagas and Christian legends as magicians and wizards." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 383 (11th ed.2006).

Remsburg first contends the trial court erred by failing to instruct the jury about concurrent causation. "A person is criminally responsible if the result would not have occurred but for his conduct, operating alone or concurrently with another cause, unless the concurrent cause was clearly sufficient to produce the result and the conduct of the actor clearly insufficient." TEX. PENAL CODE ANN. § 6.04 (Vernon 2003). Remsburg did not request an instruction on concurrent causation at trial. He is, therefore, entitled to a reversal only if he can demonstrate on appeal that he suffered "egregious harm" as a result of the jury not having been given the instruction now at issue. *See Almanza v. State,* 686 S.W.2d 157, 171 (Tex.Crim.App.1984) (op. on reh'g).

The statutory definition on concurrent causation has two parts. The first half of the definition states the general principle that a person is responsible for his or her conduct, even when the result is influenced by another's conduct: "A person is criminally responsible if the result would not have occurred but for his conduct, operating either alone or concurrently with another cause, . . . ." TEX. PENAL CODE ANN. § 6.04(a). The second half of the statutory definition contains the exception to that general principle, an exception that otherwise excuses the actor's conduct: "unless the concurrent cause was clearly sufficient to produce the result and the conduct of the actor clearly insufficient." *Id.*

The first half of the definition, when read in isolation, favors the State, whereas the second half favors the defendant. So, in this case, for Remsburg to be entitled to the jury instruction excusing his conduct, there must be some evidence that the concurrent cause (Wilson's actions) was clearly sufficient to produce the result, and the conduct of the actor (Remsburg) was clearly insufficient.

Instead, the evidence here shows that Remsburg repeatedly disobeyed the officer by ignoring Wilson's instruction to get out of the car, by struggling with Wilson once the officer jumped inside Remsburg's vehicle, by pushing the button necessary to shift the vehicle into gear once Wilson had climbed inside, and by resisting the efforts of Wilson and the other officers to restrain Remsburg both inside and outside the Cavalier. By his own admission, Remsburg did nothing to de-escalate the increasing conflict. Nor was there any affirmative testimony by Remsburg that suggests the aggravated assault on Wilson would have occurred without Remsburg's own admitted contributory conduct (pushing the accelerator and the gearshift button). Therefore, on this record, we cannot say that there is any evidence that Remsburg's conduct was clearly insufficient and that the conduct of Wilson, alone, was clearly sufficient to produce the resulting assault. Remsburg's own testimony raises, at most, an inference that the actions of both Wilson and Remsburg caused this occurrence.

An accused is entitled to a charge on every defensive issue raised by the evidence, regardless of whether it is strong, feeble, unimpeached or contradicted. *Muniz v. State,* 851 S.W.2d 238, 254 (Tex.Crim.App.1993). Conversely, the defendant is not entitled to an instruction that is not raised by the evidence. Thus, for Remsburg to be entitled to a charge on "concurrent causation," the record had to contain some evidence that the concurrent cause was clearly sufficient to produce the result and the conduct of Remsburg clearly insufficient. *See* TEX. PENAL CODE ANN. § 6.04(a); *Hutcheson v. State,* 899 S.W.2d 39, 42 (Tex.App.-Amarillo 1995, pet. ref'd). Without such evidence—and we conclude there was none here—the trial court was not required to give the concurrent causation instruction at Remsburg's request.

We overrule Remsburg's first point of error.

### B. Ineffective Assistance of Counsel

In his second point of error, Remsburg contends he received ineffective assistance at trial because his trial counsel did not voir dire on the issue of concurrent causation and did not ask for a jury instruction on concurrent causation.

The standard of testing claims of ineffective assistance of counsel is set out in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and adopted for Texas constitutional claims in *Hernandez v. State*, 726 S.W.2d 53, 57 (Tex.Crim.App.1986). To prevail, an appellant must prove by a preponderance of the evidence (1) that counsel's representation fell below an objective standard of reasonableness and (2) that the deficient performance prejudiced the defense. *Strickland*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674; *Rosales v. State*, 4 S.W.3d 228, 231 (Tex.Crim.App.1999). Under this standard, a claimant must essentially demonstrate that counsel's representation so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result. *Strickland*, 466 U.S. at 686, 104 S.Ct. 2052.

Our review of counsel's representation is highly deferential, and we indulge a strong presumption that counsel's conduct falls within a wide range of reasonable representation. *Id.* at 689, 104 S.Ct. 2052; *Tong v. State*, 25 S.W.3d 707, 712 (Tex.Crim.App.2000). This Court will not second-guess through hindsight the strategy of counsel at trial, nor will the fact that another attorney might have pursued a different course support a finding of ineffectiveness on direct appeal. *Blott v. State*, 588 S.W.2d 588, 592 (Tex.Crim. App.1979); *Harner v. State*, 997 S.W.2d 695, 704 (Tex.App.-Texarkana 1999, no

pet.). Any allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness. *Thompson v. State*, 9 S.W.3d 808, 813 (Tex.Crim.App. 1999).

When ineffective assistance is raised on direct appeal, appellate counsel and the court must proceed on a trial record not developed for the object of litigating or preserving the claim and thus often incomplete or inadequate for this purpose. *Freeman v. State*, 125 S.W.3d 505, 506 (Tex.Crim.App.2003); *cf. Massaro v. United States*, 538 U.S. 500, 504–05, 123 S.Ct. 1690, 155 L.Ed.2d 714 (2003) ("appellate counsel and the court must proceed on a trial record not developed precisely for the object of litigating or preserving the claim and thus often incomplete or inadequate for this purpose"). However, there are cases, though they are indeed rare, where "trial counsel's ineffectiveness is so apparent from the record . . ." that the inherent need for reversal is obvious. *Massaro*, 538 U.S. at 508, 123 S.Ct. 1690; *see also Freeman*, 125 S.W.3d at 507.

We have concluded that, under this record, Remsburg was not entitled to a jury instruction on concurrent causation. Consequently, counsel was not deficient in failing to request the instruction.

Further, counsel may have reasonably decided to decline to request the instruction. The first part of concurrent causation instruction explains to the jury that the defendant is not required to be the sole cause of the occurrence and may be criminally responsible even if the conduct is only a concurrent cause of the result. A reasonable defense attorney might conclude this instruction is more detrimental than helpful to the client's cause and for that reason decide to forego requesting the

instruction. Such a conclusion would at least be the product of a reasoned trial strategy, even though it is a strategy with which Remsburg's appellate counsel now disagrees in light of hindsight.[2] Moreover, it is possible counsel's own investigation of the anticipated trial testimony led him to conclude that the anticipated evidence would not support the defensive theory of concurrent causation and, therefore, there was no reason for counsel to ask the prospective jurors about that theory during voir dire.

The record before us does not support a claim of ineffective assistance of counsel.

## C. Instructing the Jury on "Serious Bodily Injury"

 In his final point of error, Remsburg asserts the trial court erred by failing to include the statutory definition of "serious bodily injury" in the jury charge. A jury charge should set forth the law applicable to the case, without expressing any opinion the trial court may have regarding the weight of the evidence and without summarizing any testimony or otherwise discussing the evidence presented. TEX.CODE CRIM. PROC. ANN. art. 36.14 (Vernon Supp.2006). When jury charge errors are brought forward on appeal, we must first determine if the complaint now raised indeed constituted error. *Abdnor v. State,* 871 S.W.2d 726, 731 (Tex.Crim.App.1994). We then determine whether the appellant preserved the alleged error at trial. If he or she did not object at trial, then the "appropriate standard [of review] is the one for fundamental error in the charge." *Jimenez v. State,* 32 S.W.3d 233, 239 (Tex. Crim.App.2000); *see also Stokes v. State,* 74 S.W.3d 48, 50 (Tex.App.-Texarkana 2002, pet. ref'd). This standard means we

should not reverse the trial court's judgment "unless the error appearing from the record was calculated to injure the rights of the defendant, or unless it appears from the record that the defendant has not had a fair and impartial trial." TEX.CODE CRIM. PROC. ANN. art. 36.19 (Vernon 2006); *see also Abdnor,* 871 S.W.2d at 732. If, however, an objection was raised in the trial court, then we must determine only whether "some harm" accrued to the defendant as a result of the error. *Jimenez,* 32 S.W.3d at 237. Stated differently, under this latter standard, we would be required to reverse the trial court's judgment for any nonstructural error unless we were convinced, beyond a reasonable doubt, that the error did not contribute to the appellant's conviction or punishment. *Id.* Under either standard for harm, the degree of harm demonstrated by the appellant must be actual, not merely theoretical. *Almanza,* 686 S.W.2d at 174; *Taylor v. State,* 146 S.W.3d 801, 804 (Tex.App.-Texarkana 2004, pet. ref'd). Here, no objection was presented concerning the failure to instruct the jury of the definition of "serious bodily injury." Consequently, the standard of review calls on us to determine whether the error was calculated to injure Remsburg's rights or whether he was otherwise denied a fair and impartial trial.

 Remsburg was charged with aggravated assault on a public servant. The amended indictment specifically alleged Remsburg "did intentionally or knowingly cause bodily injury to Greg Wilson, a public servant . . . and the defendant did use or exhibit a deadly weapon during the commission of the assault, to wit: a motor vehicle." *See* TEX. PENAL CODE ANN. § 22.02(a)(2), (b)(2)(B). The State was not required to prove Wilson suffered "serious

---

2. In some instances, the defendant's objection is that the concurrent causation instruction was improperly given—thereby expanding the

conduct for which the defendant is criminally responsible. *See Hughes v. State,* 897 S.W.2d 285, 297 (Tex.Crim.App.1994).

bodily injury," and that term appears nowhere in the indictment. That definition would be relevant only to further explain the definition given by the trial court for the term "deadly weapon."[3]

■ An appellate brief "must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record." Remsburg's appellate brief makes no effort to show what evidence in the record demonstrates actual harm as a result of the trial court failing to define a term that appears nowhere in the indictment. The totality of his argument is:

> Mr. Remsburg incurred egregious harm from the trial court's failure to define "serious bodily injury" in the charge. The jury was not instructed that serious bodily injury would mean bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ. The jury was allowed unfettered discretion to surmise that serious bodily [sic] was something far less than its statutory definition.

At best, Remsburg's argument concerns theoretical harm. The standard of review requires evidence concerning actual harm, which Remsburg has not briefed.

We overrule this final point of error as inadequately briefed and affirm the trial court's judgment.

---

3. Our law defines the term "deadly weapon" as either a firearm or as "anything that in the manner of its use or intended use is capable of causing death or serious bodily injury." Tex Penal Code Ann. § 1.07(a)(17) (Vernon Supp.2006).